**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ARMANDO CAMPOS, derivatively on behalf of TARONIS TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> ROBERT DINGESS, SCOTT MAHONEY, KEVIN POLLACK, WILLIIAM W. STAUNTON, and ERMANNO P. SANTILLI, <br><br> Defendants, <br><br> -and- <br><br> TARONIS TECHNOLOGIES, INC., <br><br> Nominal Defendant. | Civil Action No.: _____ <br><br><br> **DEMAND FOR JURY TRIAL** |

**<u>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT</u>**

Plaintiff Armando Campos ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of nominal defendant Taronis Technologies, Inc. ("Taronis" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) as officers and/or directors of Taronis for breaches of fiduciary duty, unjust enrichment, and violations of Sections 10(b) and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff bases his allegations on personal knowledge as to his own acts, and on information and belief as to all other allegations, based upon investigation by counsel, including, but not limited to, a review and analysis of: (i) regulatory filings made by Taronis with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Taronis; (iii) a securities class action lawsuit filed in the United Stated District

Court for the District of Arizona against Taronis and defendants Robert Dingess ("Dingess"), Scott Mahoney ("Mahoney"), Ermanno P. Santilli ("Santilli"), Kevin Pollack ("Pollack"), and William W. Staunton ("Staunton"), captioned *Zhu v. Taronis Technology, Inc., et al.*, Case 2:19-cv-04529-GMS (S.D.N.Y.) (the "Securities Class Action"), alleging violations of the federal securities laws based on similar facts and circumstances as alleged herein; and (iv) other publicly-available information, including media and analyst reports, concerning Taronis.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a stockholder derivative action that seeks to remedy wrongdoing committed by certain of Taronis' officers and members of the Company's Board of Directors (the "Board"). Plaintiff seeks to remedy the Individual Defendants' violations of state and federal laws from January 28, 2019 through August 19, 2019 (the "Relevant Period") that have caused and continue to cause substantial monetary damages to Taronis and other damages, including damages to its reputation and goodwill.

2.      Prior to the Relevant Period, the Company had faced delisting from the NASDAQ Capital Market ("Nasdaq") for falling below the exchange's minimum bid price of $1.00 for thirty consecutive days per Nasdaq's rules.  To regain compliance with Nasdaq's rules, the Individual Defendants (as defined herein) sought to inflate the Company's stock price.  As part of their plan, the Individual Defendants sought a reverse stock split to raise the Company's stock price.  In addition to the reverse stock split, the Individual Defendants devised a fraudulent scheme to raise the Company's stock price.

3.      On January 28, 2019, the Individual Defendants caused the Company to issue a press release announcing that the Company had won a contract with the City of San Diego to

supply its metal and cutting fuel.  On this news, the Company's stock price rose more than 25% over the following two days.

4.      However, the announcement of the purported contract with the City of San Diego was utterly false.  Taronis had no written contract with the City of San Diego, in fact, the City of San Diego had never agreed to adopt the Company's metal cutting fuel.

5.      In the weeks that followed, the truth that there was no contract with the City of San Diego was revealed.   Nevertheless, the Individual Defendants continued to make false and misleading statements to maintain or artificially inflate the Company's stock price.

6.      Throughout the Relevant Period, the Individual Defendants (a) directly participated in the management of the Company; (b) were directly involved in the day-to-day operations of the Company at the highest levels; (c) were privy to confidential proprietary information concerning the Company and its business and operations; (d) were directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein; (e) were directly or indirectly involved in the oversight or implementation of the Company's internal controls; (f) were aware of or recklessly disregarded the fact that false and misleading statements were being issued concerning the Company during and after the Relevant Period; and/or (g) approved or ratified these statements in violation of the federal securities laws.

7.      In addition, the Individual Defendants on July 29, 2019, negligently issued a materially false and misleading Proxy Statement (the "2019 Proxy") urging stockholders to reelect the Individual Defendants under false pretenses.

8.      As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other misconduct, Taronis has sustained damages as described below.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 14(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78n), and SEC Rules 14a-9 (17 C.F.R. §§ 240.10b-5, 240.14a-9) promulgated thereunder.

10.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

11.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds the sum of value of $75,000, exclusive of interest and costs.

13.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Taronis is incorporated in this District.  In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

15.     Plaintiff is a current stockholder of Taronis common stock.  Plaintiff has continuously held Taronis at least since January 2019.  Plaintiff is a citizen of Argentina.

16.     Taronis is a Delaware corporation with its principal executive offices at 300 W. Clarendon Avenue, Suite 230, Phoenix, Arizona 85013.  Taronis' shares trade on Nasdaq under the ticker symbol "TRNX."

17.     Defendant Dingess has served as Chairman of the Board of the Company since April 2013.  Defendant Dingess also served as the Chair of the Audit Committee during the Relevant Period.  In 2018, defendant Dingess received $136,250 in compensation from the Company, which consisted of mostly cash.  Upon information and belief, defendant Dingess is a citizen of Arizona.  Defendant Dingess is named as a defendant in the Securities Class Action.

18.     Defendant Mahoney has served as the Company's Chief Executive Officer ("CEO") and a member of the Board since November 2018.  Defendant Mahoney previously served as the Company's Chief Financial Officer ("CFO").  In 2018, defendant Mahoney earned $283,452 in compensation from the Company, which was divided between $215,000 in salary, $16,000 in stock awards, and $52,452 in all other compensation.  Upon information and belief, defendant Mahoney is a citizen of Arizona.  Defendant Mahoney is named as a defendant in the Securities Class Action.

19.     Defendant Pollack has served as a member of the Board since June 2012.  Defendant Pollack was a member of the Audit Committee during the Relevant Period.  In 2018, defendant Pollack received $115,625 in compensation from the Company, which consisted of mostly cash.  Upon information and belief, defendant Pollack is a citizen of Florida.  Defendant Pollack is named as a defendant in the Securities Class Action.

20.     Defendant Staunton has served as a member of the Board since April 2013.  Defendant Staunton was a member of the Audit Committee during the Relevant Period.  In 2018, defendant Staunton received $99,750 in compensation from the Company, which consisted of mostly cash.   Upon information and belief, defendant Staunton is a citizen of California.  Defendant Stanton is named as a defendant in the Securities Class Action.

21.     Defendant Santilli was the Company's Chief Technology Officer ("CTO") and a member of the Board between from June 2012 and June 2019.  Defendant Santilli also served as the Company's CEO between June 2012 and November 2018.  In 2018, defendant Santilli received $271,147 in compensation from the Company, which included $226,697 in salary, $25,000 in bonus compensation, and $19,450 in stock awards.  Defendant Santilli is named as a defendant in the Securities Class Action.  Upon information and belief, defendant Santilli is a citizen of Florida.

22.     Defendants Dingess, Pollack, and Staunton are sometimes referred to herein as the "Audit Committee Defendants."

23.     Defendants Dingess, Mahoney, Pollack, Staunton, and Santilli are sometimes referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

24.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed the Company and its stockholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

25.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

26.     In addition, as officers and/or directors of a publicly-held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock will be based on truthful and accurate information.

27.     To discharge their duties, the officers and directors of Taronis were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Taronis were required to, among other things:

a.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.      conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

28.     Each of the Individual Defendants, as an executive officer and/or director, owed to the Company and to its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

29.     The Company also maintains a Code of Business Conduct and Ethics (the "Code").  The Code sets forth legal and ethical standards of conduct for directors, officers, and employees of Taronis and its subsidiaries.

30.     According to the Code, the employees and directors of Taronis are responsible for helping Taronis maintain its good reputation and the trust and confidence of its stockholders, its employees, the public, and those with whom Taronis does business.

31.     Pursuant to the Code:

Each director, officer, employee, agent and contractor must comply with all applicable laws, regulations, rules and regulatory orders.  Company directors, officers and employees located outside of the United States must comply with laws, regulations, rules and regulatory orders of the United States, including the Foreign Corrupt Practices Act and the U.S. Export Control Act, in addition to applicable local laws.  Each director, officer, employee, agent and contractor must acquire appropriate knowledge of the requirements relating to his or her duties sufficient to recognize potential dangers and to know when to seek advice from the CEO on Company specific policies and procedures.  Violations of law, regulation, rules and orders may subject a director, officer, employee, agent or contractor to criminal or civil liability, as well as to discipline by the Company.  Such violations may also subject the Company to civil or criminal liability or the loss of business.

*       *       *

It is the Company's policy to comply fully with all applicable laws and regulations governing contact and dealings with government employees and public officials,

and to adhere to high ethical, moral and legal standards of business conduct. This policy includes strict compliance with all local, state, federal, foreign and other applicable laws, rules and regulations.

32.     In addition, the Company's Audit Committee is specifically tasked with the Board's

oversight responsibilities. According to the 2019 Proxy, the Audit Committee is charged with

oversight of:

> the Company's policies, guidelines and related practices regarding risk assessment and risk management, including the risk of fraud. As part of this endeavor, the Audit Committee reviews and assesses the Company's major financial, legal, regulatory, environmental and similar risk exposures and the steps that management has taken to monitor and control such exposures. The Audit Committee also reviews and assesses the quality and integrity of the Company's public reporting, the Company's compliance with legal and regulatory requirements, the performance and independence of the Company's independent auditors, the performance of the Company's internal audit department, the effectiveness of the Company's disclosure controls and procedures and the adequacy and effectiveness of the Company's risk management policies and related practices.

33.     In violation of their duties as members of the Audit Committee, the Audit

Committee Defendants conducted little, if any, oversight of the Company's internal controls or the

Company's compliance with legal and regulatory requirements resulting in materially false and

misleading statements regarding the Company's business, operational, and compliance policies,

and consciously disregarded their duties to monitor such controls over reporting. The Audit

Committee members' complete failure to perform their duties in good faith resulted in false

misrepresentations to the SEC, the investing public, and the Company's stockholders.

34.     In addition, as executive officers and directors of a publicly-traded company whose

common stock was registered with the SEC pursuant to the Exchange Act and traded on the

Nasdaq, the Individual Defendants had a duty not to effect the dissemination of inaccurate and

untruthful information with respect to the Company's financial condition, performance, growth,

operations, financial statements, business, products, management, earnings, internal controls, and

present and future business prospects, including false and misleading information about acquisitions, so that the market price of the Company's common stock would be based upon truthful and accurate information.  Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing Taronis to make false and misleading statements of material fact about the Company's financials and about Taronis' maintenance of adequate internal controls.

35.     Each of the Individual Defendants further owed to Taronis and its stockholders the duty of loyalty requiring that each favor Taronis' interest and that of its stockholders over their own while conducting the affairs the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

## SUBSTANTIVE ALLEGATIONS

### OVERVIEW OF TARONIS AND ITS BUSINESS

36.     Taronis, formerly known as MagneGas Applied Technology Solutions, Inc., is an energy company that purportedly offers technologies that focus on addressing the global constraints on natural resources, including fuel and water.  Taronis creates, processes, and produces hydrogen-based fuel through the gasification of carbon-rich liquids.

37.     In the past, Taronis faced delisting on Nasdaq for falling below the exchange's minimum bid price of $1.00 for thirty consecutive days per Nasdaq's rules.  On May 7, 2018, Taronis was notified by Nasdaq that it was not compliant with Nasdaq's minimum bid price rule and was given a 180-day period to regain compliance, which entailed maintaining its common stock price above $1.00 for ten consecutive days, as well as other listing standards required by Nasdaq Capital Market, where Taronis was listed.  Unfortunately, Taronis could not meet

Nasdaq's minimum bid price rule during the initial 180-day period. Subsequently, the Individual Defendants requested an additional 180-day period to regain compliance.

38.     In October 2018, the Individual Defendants sought the Company's majority stockholder to approve a reverse stock split of the outstanding common stock and treasury stock to raise Taronis' stock price and become compliant with Nasdaq's minimum bid price rule. Through a reverse stock split, a company's existing shares are consolidated into fewer, more valuable shares. Reverse stock splits are typically pursued when a company's stock has lost significant value and are one of the traditional corporate finance methods used to raise the price of company stock.

39.     On October 31, 2018, the Individual Defendants and the Company's majority stockholder approved the reverse stock split of the outstanding shares of the Company's common stock at any time on or prior to the date of May 11, 2019 and at an exchange rate of up to one hundred-for-one. Following the reverse stock split the per share price of Taronis stock was expected to "increase substantially above the market price of the common stock immediately prior to the reverse stock split."

40.     On November 6, 2018, Nasdaq informed Taronis that its request for a second 180-day period to regain compliance was granted. Between November 6, 2018 and January 1, 2019, the average price of Taronis's stock was $0.28. The average price for Taronis' stock was even lower at $0.21 between January 1, 2019 and January 27, 2019.

41.     On January 29, 2019, Taronis amended its certificate of incorporation to effectuate a reverse stock split at an exchange rate of twenty to one in order to raise its stock price within Nasdaq's minimum bid price rule.

42.     At the close of business on January 30, 2019, the Company implemented its 20 to 1 reverse stock split, issuing 1 new share for every 20 shares each investor held.

## THE INDIVIDUAL DEFENDANTS' FRAUDULENT SCHEME

43.     Around the same time the Individual Defendants were planning a reverse stock split, the Individual Defendants sought to increase the Company's stock price in other ways.  The Individual Defendants ended up devising a fraudulent scheme to artificially inflate the Company's stock price by focusing on and lying about a merely prospective business opportunity. In particular, as detailed below, the Company made false and misleading statements concerning a purported contract to supply the City of San Diego with MagneGas2, Taronis' cutting fuel.

44.     On January 28, 2019, the Individual Defendants caused Taronis to publish a press release announcing a contract with the City of San Diego.  The Individual Defendants also caused the Company to file a Form 8-K with the SEC, signed by defendant Mahoney, that the City of San Diego elected to use the Company's MagneGas2 as its fuel of choice, "marking the first major city contract for the adoption of our metal cutting fuels."   The January 28, 2019 press release was attached to the Form 8-K, which stated:

### City of San Diego Adopts MagneGas Metal Cutting Fuel

*Major New Client Win in Southern California*

TAMPA, FL – January 28, 2019 – **MagneGas Applied Technology Solutions, Inc. ("MagneGas" or the "Company") (NASDAQ: MNGA)**, a leading clean technology company in the renewable resources and environmental solutions industries, ***announced today that the City of San Diego has elected to use MagneGas as its metal cutting fuel of choice, marking the first major city contract for the adoption of our metal cutting fuels.***  The City of San Diego has historically used acetylene to maintain a wide range of equipment used for waste removal, maintenance and infrastructure support and ***as of this contract, the City will immediately begin adoption of MagneGas' cleaner and safer fuel products.*** In addition, the San Diego Continuing Education Cultural Complex ("ECC") has elected to begin using MagneGas for the training and recertification of welders in the southern California market.

"We are grateful for the opportunity to serve the City of San Diego and the San Diego Continuing Education Cultural Complex," commented Scott Mahoney, Chief Executive Officer of MagneGas. "We have been steadily marketing our propriety metal cutting fuel for one year since acquiring Complete Welding of San Diego in January of last year."

"We have been presenting our unique capabilities through periodic live demonstrations of our technology, and we have been patiently supporting the local market as we gained the trust and confidence of some of the largest consumers of metal cutting fuels in the southern California market. ***The City of San Diego's decision to adopt our product is a major milestone in our growth efforts in California.***"

Mr. Mahoney concluded, "We are also very proud of our new relationship with the San Diego Continuing Education Cultural Complex. This is one of the premier training and recertification centers for welders in southern California, and we're proud to help shape this aspect of the curriculum going forward. This relationship will quickly serve as a powerful platform for promoting our products and building new client relationships across the southern part of the state. Being deeply involved in the educational aspect of this industry is strategically important because we have the responsibility to train the next generation of welders on the newest and safest technologies and have them carry it forward in their careers."

(emphases added).

45.     On this materially false and misleading news, the Company's stock price increased over 25% in the two days following the announcement to close at $4.94 per share (when adjusted for the subsequent 20:1 reverse stock split) on January 30, 2019 with an unusual high trading volume.

46.     The January 28, 2019 press release announcing the contract with the City of San Diego gained traction with news sources and stock analysts.

47.     On January 29, 2019, a stock analyst covering Taronis for *Zacks Small-Cap Research* published a story highlighting the contract with the City of San Diego, stating "MagneGas is Adopted as the City of San Diego's metal cutting fuel of choice."

48.     On January 30, 2019, *Tampa Bay Business Journal* covered the purported contract with the City of San Diego, stating "MagneGas lands contract with San Diego, continues growth streak."

49.     On a conference call held on January 31, 2019 with analysts and investors, defendant Mahoney continued to make false statements regarding the purported contract with the City of San Diego.  During the conference call, one investor questioned whether Taronis would need to increase its production capabilities in Southern California to meet the new fuel demand arising from the government contract.

50.     Other investors expressed excitement regarding the new government contract, pointing out the growth possibility into the government service sector.  As stated on the conference call:

> Fred Walker, Private Investor
>
> ***I just want to say another thing your investors need to hear is now that you've got into municipalities, the door has been opened*** and I sell a lot of our company's products to municipalities all over the United States, ***and once you got your foot in the door with one, others listen and will take heed to the success that San Diego is gonna have with your product.  So we have – you just have a tremendous potential with growth*** and I look forward to it and you have a great product and a great team and anything I can do to help, I will be glad to help.
>
> Scott Mahoney
>
> Thank you.
>
> Moderator
>
> Our next question is from Yakov Elizarov from ECG. Please go ahead.
>
> Yakov Elizarov
>
> Yes, Mr. Mahoney, thank you.  I was wondering if you guys are looking into emerging markets such as Georgia or the Balkans where there's also LNG facilities that are being built that are significant to European energy security and significant

ports located in those two hubs.  As also if domestically you are working with for the metal cutting, if you are working with unions at all like the metalworkers?

Scott Mahoney

***Ok. So let me answer the second question first because it actually ties in to what Fred's question was just a minute ago.  So when you look at the disclosures that were shared the other day on Monday [(January 28, 2019)], I think a lot of people overlooked the school that was highlighted.*** That's extremely important because that ties into sort of the same concept as working with the unions.

(emphases added).

51.     That same day, the Company's stock price reached its high at $5.89 per share.

52.     While the Individual Defendants were touting their achievement in purportedly securing a lucrative government contract from the City of San Diego, the officials with the City of San Diego were confused by the Company's January 28, 2019 press release.

53.     In an email on January 29, 2019, the city of San Diego's Communications Department Director expressed his shock to Senior Public Information Officer that "[t]he [Taronis] news release . . . is incorrect. ***The City of San Diego does NOT have a contract with this company. . . . This is appalling that they'd get this so wrong.***" (Emphasis added).

54.     The City of San Diego's Deputy Direct of Fleet Operations similarly expressed shock by stating:

We have demo'd the product as a replacement for the oxygen and acetylene setup we currently use for our metal cutting torches.  Preliminary evaluation shows a cost savings on the gas and improved performance.  It would require a different regulator than the oxy/actyl combo and we are in the process of getting a total count and cost for the replacements.  We have not yet committed and ***by no means is there any contract with [Taronis].***"

(emphasis added).

55.     Demonstrated by the internal communications between officials at the City of San Diego, the Company's announcement that it secured a contract with the City of San Diego was utterly false.

56.     After the officials at the City of San Diego confirmed that there was no contract with the Company, on January 29, 2019, the City of San Diego's Senior Public Information Officer contacted Edison Advisors, who performed investor relations services for Taronis, demanding the immediate removal of the press release.  After communicating with Edison Advisors, the City of San Diego's Senior Public Information Officer memorialized their conversation in an email as follows:

> Thank you for speaking with me and agreeing to immediately remove the erroneous news release locate[d] here:
>
> https://globenewswire.com/news-release/2019/01/28/1706316/0/en/City-of-San-Diego-Adopts-MagneGas-Metal-Cutting-Fuel.html?print=1.
>
> As discussed, while the product has been tested, ***the City of San Diego does not have any procurement contract or any agreement with MagneGas Applied Technology Solutions, Inc. to purchase any of its products***.  If we receive any media inquiries regarding, I will ask that a retraction be issued as well.

(emphasis added).

57.     Edison Advisors apologized via email for any confusion caused by the January 28, 2019 press release and informed the City of San Diego officials that the process of retraction and removal have begun.  Defendant Mahoney was carbon copied on the email.

58.     On the same day, the Company removed the January 28, 2019 press release from its website.  Nevertheless, the Individual Defendants did not remove or retract the press release in other locations.

59.     On January 31, 2019, the Senior Public Information Officer notified Edison Advisors and defendant Mahoney that the January 28, 2019 press release was still available on the

*Globe Newswire* and requested that the press release be taken down.   Defendant Mahoney

responded that the press release "was taken off th[e] site the day you requested.  I'll follow up to

ensure that has happened as requested."   However, defendant Mahoney and the other Individual

Defendants did not retract the press release from *Globe Newswire*.  The January 29, 2019 release

is still available at:  http://www.globenewswire.com/news-release/2019/01/28/1706316/0/en/City-

of-San-Diego-Adopts-MagneGas-Metal-Cutting-Fuel.html (last visited September 27, 2019).

**THE TRUTH IS GRADUALLY REVEALED**

60.     Some investors noticed that the Company's website no longer had the January 28,

2019 press release.   On January 30, 2019, one investor, going by the Twitter username

HansMalzer, questioned:

> There is already a filing of the San Diego deal.  The announcement on the website
> disappeared though.  AND there is none on twitter yet.  What happened?  Was it
> an unintentional/premature/leaked announcement you planned to announce later
> this week (tomorrow)??

61.     The Company's stock price began to slide at the uncertainty of the Company's

contract with the City of San Diego.  On February 1, 2019, the Company's stock closed at $2.99.

62.     On February 6, 2019, the Company announced a secondary stock offering

registering over 3 million shares.

63.     On February 11, 2019, another investor, going by the Twitter username ileberrynix

wrote:

> This company was MagnaGas, they changed names due to their bad reputation of
> reverse splits & ripping off retail investors.  I was told they published news that
> they signed a deal with the city of San Diego & the mayor made them take down
> the news because it wasn't true.  Beware..

64.     By February 11, 2019, the Company's stock price slid down to $0.97.

65.     On February 12, 2019, the Company filed a Form 8-K/A with the SEC signed by

defendant Mahoney that finally corrected the January 28, 2019 press release.  In the Form 8K/A

the Company stated:

> On January 28, 2019, Taronis Technologies, Inc., formerly known as MagneGas
> Applied Technology Solutions, Inc. (the "Company") issued a press release and
> filed a corresponding Current Report on Form 8-K with the SEC, which stated that
> the City of San Diego had elected to use MagneGas2 as its metal cutting fuel of
> choice and that this was the first major city contract for the adoption of the
> Company's metal cutting fuels.  The Company has determined that it is necessary
> to correct its prior disclosure.  The Company has an approval and a written
> authorization from the City of San Diego's Fleet Operations to move forward with
> the procurement of gas and other hard goods from the Company at three different
> locations within the City.  This procurement covers more than one division within
> the municipality, and was received from a city official with sufficient authority to
> approve the procurement process.  In the welding supply and gas distribution
> business purchases and sales of hard goods and gases are typically made through a
> process whereby a purchaser receives a quote for goods from the seller and then
> places an order which is later memorialized in a purchase order.  The Company
> treats purchase orders as contracts and made its prior disclosure with that treatment
> in view, however, ***the Company does not have any formal binding contracts,
> agreements or long-term purchase commitments with the City of San Diego
> beyond the existing approval, nor any commitment that any of the Company's
> products will be purchased as the products of choice for their respective
> applications***.

(emphasis added).

66.     The Company's disclosure on the Form 8-K/A was also false and misleading, as

detailed below.  The Company did not have "an approval and written authorization from the City

of San Diego's Fleet Operations to move forward with the procurement of gas and other hard

goods from the Company at three different locations within the City" at that time.

67.     The Individual Defendants continued to make false and misleading statements

regarding servicing the City of San Diego to continue artificially inflating the Company's stock

price, so that the Company would be compliant with Nasdaq's minimum bid price rule.

68.     On April 8, 2019, the Company filed a Form 10-K with the SEC reporting the Company's results for 2018 (the "2018 Annual Report"). The 2018 Annual Report noted that "the price of our Common Stock subsequently fell below $1.00 due to uncontrollable market conditions prior to having traded above $1.00 for the minimum ten consecutive business days required to regain compliance." Nevertheless, the stock price fell due to the Individual Defendants' false and misleading statements regarding its purported contract with the City of San Diego and when the investors discovered that the statements were misleading.

69.     On an earnings call held on August 19, 2019, the Individual Defendants continued to make false and misleading statements regarding the purported contract with the City of San Diego. During the earnings call, defendant Mahoney stated:

> So we had a purchase order from three different departments from the city of San Diego. We asked consent from the guy that we had the written purchase contracts from to use their name and go ahead and let them know or let everybody know that we had won a new customer.
>
> And when that went out, someone upstairs got a call from the incumbent provider, who is all bent out of shape, it's one of the big guys, and said hey, are you guys switching everything you do? Meaning, buying things other than our MagneGas. So, buying wire, or welding equipment, or protective gear. I mean this was a contract for like hundreds of thousands of dollars. So guy said no, we are just buying some MagneGas.
>
> We like the product. I mean, like well, if you guys don't make him take that press release down we're going to stop doing business with you, and we're going to say that you breached your other purchase agreements. So if I'm selling him MagneGas, it has nothing to do with him buying some welding equipment, right? The other guy tied it and said – the other guy said, you have to basically make them take the press release down.
>
> So as a courtesy to a customer, we took the press release down. That's it.

70.     As shown by internal communications between the officials at the City of San Diego and communications between the Company, Edison Advisors, and the officials at the City of San Diego clearly shows that there was no written purchase contracts on January 28, 2019 nor

any written purchase orders from three different departments of the City of San Diego. Further, the Company did not take the January 28, 2019 press release down as a courtesy to a customer. Rather, it was taken down because the press release made statements that were absolutely untrue.

## THE INDIVIDUAL DEFENDANTS ISSUED A MATERIALLY FALSE AND MISLEADING PROXY STATEMENT

71.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants also caused the Company to issue a false and misleading proxy statement. Specifically, the Company's 2019 Proxy sought stockholder votes to reelect the Individual Defendants.

72.     The Individual Defendants drafted, reviewed, and/or signed the 2019 Proxy before it was filed with the SEC and disseminated to Taronis's stockholders. The Individual Defendants negligently issued materially misleading statements in the 2019 Proxy. These 2019 Proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the 2019 Proxy allegations and related claims.

73.     In support of the Individual Defendants' bid to reelect the Individual Defendants, the Individual Defendants highlighted their supposed oversight of the Company. In particular, the 2019 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that Taronis faces, including legal and regulatory risks, and financial controls. The 2019 Proxy stated:

> **Board Oversight of Risk**
>
> Our Board is primarily responsible for overseeing our risk management processes. The Board receives and reviews periodic reports from management, auditors, legal

counsel and others, as considered appropriate regarding our assessment of risks. The Board focuses on the most significant risks facing the Company and our general risk management strategy, and also ensures that risks undertaken by the Company are consistent with the Board's tolerance for risk.  While the Board oversees our risk management, management is responsible for day-to-day risk management processes.  We believe this division of responsibilities is the most effective approach for addressing the risks facing the Company and that our Board leadership structure supports this approach.

The Audit Committee assists our Board in its general oversight of, among other things, the Company's policies, guidelines and related practices regarding risk assessment and risk management, including the risk of fraud.  As part of this endeavor, the Audit Committee reviews and assesses the Company's major financial, legal, regulatory, environmental and similar risk exposures and the steps that management has taken to monitor and control such exposures.  The Audit Committee also reviews and assesses the quality and integrity of the Company's public reporting, the Company's compliance with legal and regulatory requirements, the performance and independence of the Company's independent auditors, the performance of the Company's internal audit department, the effectiveness of the Company's disclosure controls and procedures and the adequacy and effectiveness of the Company's risk management policies and related practices.

*       *       *

**Audit Committee**

Our Audit Committee, which currently consists of three directors, provides assistance to our Board in fulfilling its legal and fiduciary obligations with respect to matters involving the accounting, financial reporting, internal controls and compliance functions of the Company.  Our Audit Committee employs an independent registered public accounting firm to audit the financial statements of the Company and perform other assigned duties.  Further, our Audit Committee provides general oversight with respect to the accounting principles employed in financial reporting and the adequacy of our internal controls.  In discharging its responsibilities, our Audit Committee may rely on the reports, findings and representations of our auditors, legal counsel and responsible officers.  Our Board has determined that all members of the Audit Committee are financially literate within the meaning of SEC rules and under the current listing standards of Nasdaq. Our Board has also determined that Mr. Dingess qualifies as an "audit committee financial expert."  The Audit Committee met four times in 2018.

74. The 2019 Proxy thus assured stockholders that Individual Defendants were involved

with Taronis's business strategy, actively monitored the Company's risks and exposures,

following good corporate governance practices and acting in an ethical and legal manner.  In reality, the Individual Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Company from employing a deceptive scheme or device to deceive the public investors as to the success and viability of the Company's business by:  (i) engaging in a scheme to misrepresent the existence of a material contract between Taronis and the City of San Diego; (ii) participating, directly and indirectly, in the preparation and issuance of the materially false and misleading January 28 press release; and (iii) participating, directly and indirectly, in the decision not to issue any kind of corrective disclosure until after Taronis failed to comply with Nasdaq's minimum bid price upon completion of the ten (10) day business period following the issuance of the January 28 press release.

75.     As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect the Individual Defendants to the Board.

## DAMAGES TO THE COMPANY

76.     As a result of the Individual Defendants' wrongful conduct, Taronis disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Taronis's credibility.  Taronis has been, and will continue to be, severely damaged by the Individual Defendants' misconduct.

77.     Furthermore, aside from ruining the Company's reputation for honesty, integrity, and aptitude, the Individual Defendants have exposed the Company to very expensive legal costs to defend, investigate, and pay judgment or settlement in the Securities Class Action.

78.     As a direct and proximate result of the Individual Defendants' actions as alleged above, Taronis's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

79.     Moreover, these actions have irreparably damaged Taronis's corporate image and goodwill.  For at least the foreseeable future, Taronis will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Taronis's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

80.     Plaintiff incorporates the allegations herein by reference.

81.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

82.     Plaintiff is a stockholder of Taronis, was a stockholder of Taronis at the time of the wrongdoing alleged herein, and has been a stockholder of Taronis continuously since that time.

83.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

84.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Taronis Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

85.     At the time of the filing of this complaint, the Taronis Board consists of four individuals:  Defendants Mahoney, Dingess, Pollack, and Staunton.

86.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Taronis Board to institute this action against the Individual Defendants.  Such a demand would have been a futile and useless act with respect to each and every one of the directors of the Board because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**DEMAND IS FUTILE AS TO ALL DIRECTORS OF THE BOARD BECAUSE THEY FACE SUBSTANTIAL LIKELIHOOD OF LIABILITY**

87.     The current members of the Board all face a substantial likelihood of liability for their individual misconduct.  The current members of the Board were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

88.     Moreover, as directors, the current members of the Board owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and/or with reckless disregard allowed Taronis to devise a fraudulent scheme to artificially inflate the Company's stock price and reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

89.     The current members of the Board knowingly and/or recklessly allowed Taronis to devise a fraudulent scheme to artificially inflate the Company's stock price, made or authorized

false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence.

90.     These actions constitute breaches of the fiduciary duties of loyalty and good faith, for which the current members of the Board face a substantial likelihood of liability.  If the current members of the Board were to bring a suit on behalf of Taronis to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile as to the current members of the Board.

91.     Further, the current members of the Board are incapable of considering a demand to commence and vigorously prosecute this action because they face additional substantial likelihood of liability as they are named defendants in the Securities Class Action.

**DEFENDANT MAHONEY LACKS INDEPENDENCE**

92.     Defendant Mahoney is not disinterested for purposes of demand futility because his principal occupation is serving as Taronis's CEO.  Further, according to the Company's SEC filings, in 2018, Mahoney received total compensation of $283,452.  This amount is material to him.

93.     Further, Mahoney is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

**DEMAND IS EXCUSED AS TO THE AUDIT COMMITTEE DEFENDANTS BECAUSE AS MEMBERS OF THE AUDIT COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

94.     As members of the Audit Committee during the Relevant Period, the Audit Committee Defendants participated in and knowingly approved Taronis' fraudulent scheme to artificially inflate the Company's stock price and filing of false financial statements and allowed the Individual Defendants to repeatedly make other false and misleading statements to the investing public.  More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to oversee and monitor (a) the integrity of the Company's financial statements, and (b) the Company's compliance with legal and regulatory requirements.  Instead, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and compliance with legal and regulatory requirements.  For this reason, demand is futile as to the Audit Committee Defendants.

95.     Further, the Audit Committee Defendants are incapable of considering a demand to commence and vigorously prosecute this action because they face additional substantial likelihood of liability as they are named defendants in the Securities Class Action.

<u>**COUNT I**</u>
**BREACH OF FIDUCIARY DUTY**
**(Against the Individual Defendants)**

96.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

97.     Each of the Individual Defendants owed and owe to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Taronis' business and affairs.

98.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

99.     In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

100.    The Individual Defendants also breached their fiduciary duties by causing the Company to devise a fraudulent scheme to artificially inflate the Company's stock price.

101.    In addition, the Individual Defendants further breached their fiduciary duties owed to Taronis by willfully or recklessly making and/or causing the Company to employ a deceptive scheme or device to deceive Plaintiff and members of the Class as to the success and viability of the Company's business by:  (i) engaging in a scheme to misrepresent the existence of a material contract between Taronis and the City of San Diego; (ii) participating, directly and indirectly, in the preparation and issuance of the materially false and misleading January 28 press release; and (iii) participating, directly and indirectly, in the decision not to issue any kind of corrective disclosure until after Taronis failed to comply with Nasdaq's minimum bid price upon completion of the ten (10) day business period following the issuance of the January 28 press release.

102.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

103.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were

not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

104.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

105.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Taronis has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II
### UNJUST ENRICHMENT
### (Against the Individual Defendants)

1.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

2.    The Insider Selling Defendants have been unjustly enriched at the expense of box, in the form of their illegal stock sales as explained herein.

3.    By their wrongful acts and omissions, the Insider Selling Defendants were unjustly enriched at the expense of and to the detriment of Box.

4.    Plaintiff, as a stockholder and representative of Box, seeks restitution from the Insider Selling Defendants and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Insider Selling Defendants, and each of them, from their wrongful conduct and fiduciary breaches in connection their illegal stock sales.

## COUNT III
### VIOLATIONS OF SECTION 10(B) AND RULE 10B-5 OF THE EXCHANGE ACT
**(Against the Individual Defendants)**

106.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

107.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

108.     As alleged herein, the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by participating in a fraudulent scheme and course of conduct in connection with the purchase or sale of Taronis common stock, and by making false and misleading statements and omissions in connection with the purchase or sale of Taronis common stock.

109.     By virtue of their positions with Taronis, the Individual Defendants participated in the operation and management of the Company and conducted and participated, directly or indirectly, in the conduct of its business affairs.  The Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Taronis, including the content and dissemination of the January 28 press release to the marketplace during the Relevant Period, which Plaintiff contends is false and misleading, and the Company's plan, scheme, and course of conduct.  The Individual Defendants were provided with, or had access to, copies of the Company's reports, press releases, and public filings.  Moreover, the Individual Defendants were provided with, or had access to, copies of the January 28 press release and the Company's emails with the City of San Diego and had the ability to prevent the issuance of the false and misleading statements and omissions, or cause the false and misleading statements and omissions to be corrected.

110.   As officers and/or directors of a publicly-owned company, the Individual Defendants had a duty to disseminate accurate and truthful information about Taronis to the investing public, and to correct promptly any public statements issued by Taronis that had become materially false or misleading.   In addition, Defendant Mahoney had direct and supervisory involvement in the day-to-day operations of Taronis and, therefore, is presumed to have had the power to control of the particular transactions giving rise to the securities violations alleged herein, and exercised such power.

111.   As a direct and proximate cause of the Individual Defendants' wrongful conduct alleged herein, Plaintiff and other members of the Company have suffered damages in connection with their purchases of Taronis common stock in an amount to be established at trial.

### COUNT III
#### VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT
#### (Against the Individual Defendants)

112.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

113.   The section 14(a) Exchange Act claims alleged herein are based solely on negligence.   They are not based on any allegation of reckless or knowing conduct by or on behalf of defendants the Individual Defendants.   The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud.   Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

114.   The Individual Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2019 Proxy.   In the 2019 Proxy, the Board solicited stockholder votes to reelect the Individual Defendants.

115.     The 2019 Proxy, however, misrepresented and failed to disclose that the Board's risk oversight and the Company's inadequate internal controls which facilitated the illegal behavior described herein.  By reasons of the conduct alleged herein, the Individual Defendants violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Amyris misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Individual Defendants.

116.     Plaintiff, on behalf of Taronis, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2019 Proxy in connection with the improper reelection of the Individual Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of Taronis and that Plaintiff is a proper and adequate representative of the Company;

B.     Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.     Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 30, 2019                    Respectfully Submitted,

                                             /s/ Blake A. Bennett_____
                                             **COOCH AND TAYLOR, P.A.**
                                             Blake A. Bennett (#5133)
                                             1007 N. Orange St., Suite 1120
                                             Wilmington, DE 19801
                                             Telephone: (302) 984-3800
                                             Email: bbennett@coochtaylor.com

                                             *Attorney for Plaintiff*


**OF COUNSEL**

**BRAGAR EAGEL & SQUIRE, P.C.**
W. Scott Holleman
Marion C. Passmore
Garam Choe
Alexandra B. Raymond
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone: (646) 860-9449

*Attorneys for Plaintiff*